RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 14a0125p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

---

SARAH JONES,

*Plaintiff-Appellee,*

*v.*

DIRTY WORLD ENTERTAINMENT RECORDINGS LLC, et al.,

*Defendants,*

HOOMAN KARAMIAN, aka Nik Richie, aka Corbin Grimes; DIRTY WORLD, LLC, dba thedirty.com,

*Defendants-Appellants.*

No. 13-5946

---

Appeal from the United States District Court
for the Eastern District of Kentucky at Covington.
No. 2:09-cv-00219—William O. Bertelsman, District Judge.

Argued: May 1, 2014

Decided and Filed: June 16, 2014

Before: GUY, GIBBONS, and GRIFFIN, Circuit Judges.

---

**COUNSEL**

**ARGUED:** David S. Gingras, GRINGAS LAW OFFICE, PLLC, Phoenix, Arizona, for Appellants. Christopher D. Roach, ERIC C. DETERS & PARTNERS, P.S.C., Independence, Kentucky, for Appellee. **ON BRIEF:** David S. Gingras, GRINGAS LAW OFFICE, PLLC, Phoenix, Arizona, Alexander C. Ward, Alexis B. Mattingly, HUDDLESTON BOLEN, LLP, Ashland, Kentucky, for Appellants. Eric C. Deters, ERIC C. DETERS & PARTNERS, P.S.C., Independence, Kentucky, for Appellee. Marc J. Randazza, RANDAZZA LEGAL GROUP, Las Vegas, Nevada, John C. Greiner, GRAYDON HEAD & RITCHEY LLP, Cincinnati, Ohio, Patrick J. Carome, Samir C. Jain, WILMER CUTLER PICKERING HALE AND DORR LLP, Washington, D.C., Junis L. Baldon, FROST BROWN TODD LLC, Louisville, Kentucky, William E. Sharp, ACLU OF KENTUCKY, Louisville, Kentucky for Amici Curiae.

———————————

**OPINION**

———————————

JULIA SMITH GIBBONS, Circuit Judge.   This case presents the issue of whether the Communications Decency Act of 1996 (CDA), 47 U.S.C. § 230, bars the state-law defamation claims of plaintiff-appellee Sarah Jones.   Jones was the unwelcome subject of several posts anonymously uploaded to www.TheDirty.com, a popular website operated by defendants-appellants Nik Lamas-Richie and DIRTY WORLD, LLC ("Dirty World"), and of remarks Richie posted on the site.   The website enables users to anonymously upload comments, photographs, and video, which Richie then selects and publishes along with his own distinct, editorial comments.   In short, the website is a user-generated tabloid primarily targeting non-public figures.

In response to the posts appearing on www.TheDirty.com, Jones brought an action in federal district court alleging state tort claims of defamation, libel *per se*, false light, and intentional inflection of emotional distress.   Richie and Dirty World claimed that § 230(c)(1) barred these claims.   The district court rejected this argument and denied defendants-appellants' motion to dismiss, motion for summary judgment, motion to revise judgment, and motion for judgment as a matter of law.   The district court also denied Richie's and Dirty World's motion for leave to file an interlocutory appeal.   The case was submitted to a jury, twice.   The first trial ended in a mistrial upon a joint motion.   The second trial resulted in a verdict in favor of Jones for $38,000 in compensatory damages and $300,000 in punitive damages.   On appeal, Richie and Dirty World maintain that § 230(c)(1) barred Jones's claims.

This is a case of first impression in this circuit.   In *Doe v. SexSearch.com*, we "explicitly reserve[d] the question of [the] scope [of the CDA] for another day."   551 F.3d 412, 416 (6th Cir. 2008).   We now consider when a website is not an "information content provider" under 47 U.S.C. § 230(f)(3) with respect to information it publishes such that § 230(c)(1) bars state-law tort claims predicated on that information.

Jones was found to be the object of defamatory content published on a user-generated, online tabloid; however, the judgment in her favor cannot stand. Under the CDA, Richie and Dirty World were neither the creators nor the developers of the challenged defamatory content that was published on the website. Jones's tort claims are grounded on the statements of another content provider yet seek to impose liability on Dirty World and Richie as if they were the publishers or speakers of those statements. Section 230(c)(1) therefore bars Jones's claims. Accordingly, we vacate the judgment in favor of Jones and reverse the district court's denial of Dirty World's and Richie's motion for judgment as a matter of law with instructions to enter judgment as a matter of law in their favor.

I.

Richie is currently employed as the manager of DIRTY WORLD, LLC ("Dirty World"), which owns and operates the website www.TheDirty.com. Richie is also the founder of www.DirtyScottsdale.com, which he started in March 2007. Richie created www.DirtyScottsdale.com as a forum to post comments and observations about residents of Scottsdale who he believed warranted comment. Richie's website garnered attention from national media, and, as the site increased in popularity, it branched out to cover more than seventy different cities in the United States and Canada. The site then adopted a geographically neutral name—www.TheDirty.com. The website receives approximately six hundred thousand visits each day and eighteen million visits each month.

As the website grew, its focus and format changed. In the beginning, Richie created nearly all the content on the site, and users could not directly upload content. This is no longer true. For the past several years and currently, users of the site, who colloquially refer to themselves as "The Dirty Army," may submit "dirt"—*i.e.*, content that may include text, photographs, or video about any subject. Users may also post comments about the content submitted by others. The vast majority of the content appearing on www.TheDirty.com is comprised of submissions uploaded directly by third-party users.

The content submission form instructs users to "Tell us what's happening. Remember to tell us who, what, when, where, why." The content submission form requires users to submit a title and category for their submission as well as their city or college for indexing. Submissions

appear on the website as though they were authored by a single, anonymous author—"THE DIRTY ARMY." This eponymous introduction is automatically added to every post that Richie receives from a third-party user. Many, but not all, of the submissions and commentaries appearing on the website relate to stories, news, and gossip about local individuals who are not public figures. The site receives thousands of new submissions each day. Richie or his staff selects and edits approximately 150 to 200 submissions for publication each day. The editing done to published submissions only consists of deletion. Richie or his staff briefly reviews each submission selected for publication to ensure that nudity, obscenity, threats of violence, profanity, and racial slurs are removed. Richie typically adds a short, one-line comment about the post with "some sort of humorous or satirical observation." Richie, however, does not materially change, create, or modify any part of the user-generated submission, nor does he fact-check submissions for accuracy. Apart from his clearly denoted comments appended at the end of each submission, which appear in bold-face text and are signed "-nik," Richie does not create any of the posts that appear on www.TheDirty.com. The bold-face text and signature are designed to distinguish editorial remarks from third-party submissions. Comments that appear in bold face and are signed "-nik" are only written and published by Richie.

Sarah Jones is a resident of northern Kentucky. Jones was a teacher at Dixie Heights High School in Edgewood, Kentucky, and a member of the Cincinnati BenGals, the cheerleading squad for the Cincinnati Bengals professional football team. From October 2009 to January 2010, Jones was the subject of several submissions posted by anonymous users on www.TheDirty.com and of editorial remarks posted by Richie.

First, on October 27, 2009, a visitor to www.TheDirty.com submitted two photographs of Jones and a male companion and the following post:

> THE DIRTY ARMY: Nik, this is Sara J, Cincinnati Bengal Cheerleader. She's been spotted around town lately with the infamous Shayne Graham. She has also slept with every other Bengal Football player. This girl is a teacher too!! You would think with Graham's paycheck he could attract something a little easier on the eyes Nik!

Appearing directly beneath this post, Richie added:

> Everyone in Cincinnati knows this kicker is a Sex Addict.  It is no secret… he can't even keep relationships because his Red Rocket has freckles that need to be touched constantly. – nik

Jones requested that the post be removed.  Richie informed Jones that the post would not be removed.

Second, on December 7, 2009, a visitor submitted a photograph of Jones and the following post:

> THE DIRTY ARMY: Nik, here we have Sarah J, captain cheerleader of the playoff bound cinci bengals. . Most ppl see Sarah has [*sic*] a gorgeous cheerleader AND highschool teacher. . yes she's also a teacher. . but what most of you don't know is. . Her ex Nate. . cheated on her with over 50 girls in 4 yrs. . in that time he tested positive for Chlamydia Infection and Gonorrhea. . so im sure Sarah also has both. . whats worse is he brags about doing sarah in the gym. . football field. . her class room at the school she teaches at DIXIE Heights.

Appearing directly after this post, Richie remarked: "Why are all high school teachers freaks in the sack?- nik"

Third, on December 9, 2009, a visitor submitted another photograph of Jones and a male companion and the following post:

> THE DIRTY ARMY: Nik, ok you all seen the past posting of the dirty Bengals cheerleader/teacher. . . well here is her main man Nate.  Posted a few pics of the infected couple.  Oh an for everyone saying sarah is so gorgeous check her out in these non photoshopped pics.

Appearing directly after this post, Richie added:

> Cool tribal tat man.  For a second yesterday I was jealous of those high school kids for having a cheerleader teacher, but not anymore. – nik

Jones sent Richie over twenty-seven emails, pleading for Richie to remove these posts from the website, to no avail.  Jones's father similarly wrote to Richie, also to no avail.  She then sought legal help, and her attorney informed Richie that if the posts were not removed by December 14, 2009, Jones would file suit.  The posts were not removed.  Jones, *qua* Jane Doe, filed in federal district court this action on December 23, 2009, against Dirty World Entertainment Recordings, LLC, which operated a website called www.thedirt.com.  Apparently, Jones sued the wrong party, as neither Richie nor Dirty World has or ever had any relationship

with either Dirty World Entertainment Recordings, LLC, or www.thedirt.com.[1]   Nevertheless, the lawsuit sparked national media attention, which precipitated further postings on www.TheDirty.com regarding Jones.

> For instance, on December 29, a visitor submitted a photograph and the following post:

> THE DIRTY ARMY: Nik, i just saw the Huffington Post and I just [*sic*] the latest post on beat Bang-GALS cheer squad and back in May I was out clubbing in Cinci and those cheer chicks were hosting the club and i could not believe how ugly they were, here is some pics of them from that night.

Richie added:

> I think they all need to be kicked off and the Cincinnati Bengals should start over. Note to self: Never try to battle the DIRTY ARMY. – nik

> Also, on December 29, 2009, a visitor to the website published two photographs and the

following post:

> THE DIRTY ARMY: Nik since the Bengals organization loves you so much i decided to submit some pics from a recent cheerleader calendar release party I went to, to show how beat there squad is with out make up and being half naked. Reality is their cheerleaders are FUGLY and the whole NFL thinks they are beat.

Richie added:

> I love how the DIRTY ARMY has a war mentality. . . why go after one ugly cheerleader when you can go after all the brown baggers.  (Sorry Cleveland Browns that was not a stab at your girls.) – nik

On January 9, 2010, the October 27, 2009, submission was reposted after Richie added an additional comment, which specifically related to the 2009 NFL playoffs.  After the litigation commenced, Richie posted a public letter to Jones:

> If you know the truth then why do you care?  With all the media attention this is only going to get worse for you.  Your lawyer is trying to make a name for himself using you as his pawn.  If anything me just seeing your face on the news right now will get you fired from your job.  All you had to do is read the FAQ

---

[1]In his affidavit, Richie stated that www.thedirty.com is owned and operated by Dirty World, LLC, not Dirty World Entertainment Recordings, LLC.  In her second amended complaint, Jones properly added Dirty World, LLC dba Thedirty.com as a party.

> section like every other normal person to get stuff removed.  You dug your own grave here Sarah.  I am a very reasonable person… hope it was worth it.- nik.

He also removed the first three posts regarding Jones.  The posts on www.TheDirty.com humiliated Jones, allegedly undermining her position as an educator, her membership in the Cincinnati BenGals, and her personal life.

Jones amended her action to proceed against Dirty World Entertainment Recordings, LLC, dba www.thedirt.com; Hooman Karamian, aka Nik Richie, aka Corbin Grimes; Dirty World, LLC, dba www.TheDirty.com; and Dirty World Entertainment, LLC, dba www.TheDirty.com, alleging claims of defamation, libel *per se*, false light, and intentional inflection of emotional distress.  Dirty World moved to dismiss, arguing that the district court lacked jurisdiction over Dirty World and that Jones failed to state a claim upon which relief may be granted.  Richie (formerly known as Hooman Karamian) also moved to dismiss, arguing insufficiency of service of process, lack of personal jurisdiction, and failure to state a claim upon which relief may be granted.  The district court denied both motions.  *See Jones v. Dirty World Entm't Recordings, LLC (Jones II)*, No. 2009-219, 2011 WL 1457343, at *1−2 (E.D. Ky. Apr. 15, 2011); *Jones v. Dirty World Entm't Recordings, LLC (Jones I)*, 766 F. Supp. 2d 828, 828−36 (E.D. Ky. 2011).  In their motions to dismiss, both Dirty World and Richie argued that under the CDA, 47 U.S.C. § 230(c), they are immune from suit.  The district court treated the CDA argument as a motion for summary judgment and granted Jones's oral motion for a period of discovery to respond.  *Jones II*, 2011 WL 1457343, at *2; *Jones I*, 766 F. Supp. 2d at 836.

Dirty World and Richie then moved for summary judgment, arguing that § 230(c)(1) affords them immunity from liability for content created by third parties and that the content they created, as opposed to that created by third parties, constitutes non-actionable expressions of opinion that are non-defamatory as a matter of law.  The district court denied the motion, holding that Dirty World and Richie are not entitled to immunity under the CDA.  *Jones v. Dirty World Entm't Recordings, LLC (Jones III)*, 840 F. Supp. 2d 1008, 1010−13 (E.D. Ky. 2012).  The case was tried and submitted to a jury, but upon a joint motion by both parties, the court declared a mistrial.

Dirty World and Richie then filed a motion under Federal Rule of Civil Procedure 54(b), requesting that the court change its order holding that Dirty World and Richie were not entitled to immunity under the CDA. In the alternative, Dirty World and Richie moved for an order certifying the issue for an immediate interlocutory appeal pursuant to 28 U.S.C. § 1292(b). The district court treated the motion as a second motion for summary judgment and denied it. The district court also denied the alternative motion for leave to file an interlocutory appeal. The case was again tried. *See Jones v. Dirty World Entm't Recordings, LLC (Jones IV)*, 965 F. Supp. 2d 818, 819 (E.D. Ky. 2013). At the conclusion of the presentation of evidence in the second trial, Dirty World and Richie made a timely motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50. Their Rule 50 motion again claimed immunity. *See id.* The district court denied the motion, holding that "a website owner who intentionally encourages illegal or actionable third-party postings to which he adds his own comments ratifying or adopting the posts becomes a 'creator' or 'developer' of that content and is not entitled to immunity." *Id.* at 821. Thus, the district court concluded that "[d]efendants, when they re-published the matters in evidence, had the same duties and liabilities for re-publishing libelous material as the author of such materials."

The case was submitted to the second jury, which returned a verdict in favor of Jones for $38,000 in compensatory damages and $300,000 in punitive damages. The district court entered a judgment in favor of Jones. Dirty World and Richie timely filed a notice of appeal from the district court's (1) entry of final judgment in favor of Jones, (2) denial of their motions to dismiss for lack of personal jurisdiction, and (3) denial of their motion for judgment as a matter of law. The sole issue on appeal is whether the district court erred in denying Dirty World's and Richie's motion for judgment as a matter of law by holding that the CDA does not bar Jones's state tort claims.

## II.

### A.

"We review a district court's denial of a motion for judgment as a matter of law or a renewed motion for judgment as a matter of law *de novo*." *Noble v. Brinker Int'l, Inc.*, 391 F.3d 715, 720 (6th Cir. 2004) (citing *United States v. Alpine Indus., Inc.*, 352 F.3d 1017, 1022 (6th

Cir. 2003)).   The only claim that Dirty World and Richie raise on appeal is entitlement to immunity under the CDA.   Appellants argued immunity under the CDA several times before the district court; hence, the claim is properly presented on appeal, *cf. Dunlap v. Mich. Dep't of Corr.*, 65 F. App'x 971, 972 (6th Cir. 2003), and reviewed *de novo*, *Smith v. Leis*, 407 F. App'x 918, 927 (6th Cir. 2011) ("Claims of entitlement to immunity are questions of law, therefore they are reviewed de novo.").   Any other claim or defense that they argued before the district court is waived.  *See Farm Labor Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523, 544 n.8 (6th Cir. 2002) ("It is well established that an issue not raised in a party's briefs on appeal may be deemed waived." (citing *Ahlers v. Schebil*, 188 F.3d 365, 374 (6th Cir. 1999))).

B.

We begin with a discussion of § 230 of the CDA.  Section 230 of the CDA immunizes providers of interactive computer services[2] against liability arising from content created by third parties. Section 230(c)(1) provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."   Although § 230(c)(1) does not explicitly mention immunity or a synonym thereof, this and other circuits have recognized the provision to protect internet service providers for the display of content created by someone else.  *Seaton v. TripAdvisor LLC*, 728 F.3d 592, 599 n.8 (6th Cir. 2013) (recognizing that § 230(c)(1) provides immunity); *see also Almeida v. Amazon.com, Inc.*, 456 F.3d 1316, 1321 (11th Cir. 2006) ("The majority of federal circuits have interpreted the CDA to establish broad federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service.") (internal citations and quotations omitted); *accord Johnson v. Arden*, 614 F.3d 785, 791 (8th Cir. 2010); *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008); *Chicago Lawyers' Comm. for Civil Rights Under Law, Inc. v. Craigslist, Inc.*, 519 F.3d 666, 671 (7th Cir. 2008); *Universal Commc'n Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413, 418−19 (1st Cir. 2007); *Batzel v. Smith*, 333 F.3d 1018, 1026−30 (9th Cir. 2003); *Green v. Am. Online (AOL)*, 318 F.3d 465, 471 (3d Cir.

---

[2]"The term 'interactive computer service' means any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions."  47 U.S.C. § 230(f)(2).  These providers include broadband providers, hosting companies, and website operators like Dirty World and Richie.

2003); *Ben Ezra, Weinstein, & Co. v. AOL*, 206 F.3d 980, 984−85 (10th Cir. 2000); *Zeran v. AOL*, 129 F.3d 327, 328 (4th Cir. 1997).  Furthermore, § 230(e)(3) provides that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section."  47 U.S.C. § 230(e)(3).

Section 230 marks a departure from the common-law rule that allocates liability to publishers or distributors of tortious material written or prepared by others.  *See Batzel*, 333 F.3d at 1026−27.  "Absent § 230, a person who published or distributed speech over the Internet could be held liable for defamation even if he or she was not the author of the defamatory text, and, indeed, at least with regard to publishers, even if unaware of the statement."  *Id.* (citing *Stratton Oakmont, Inc. v. Prodigy Servs. Co.*, 1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995) (pre-CDA case holding internet service provider liable for posting by third party on one of its electronic bulletin boards)).  Congress, however, decided to treat the internet differently.  *Id.*

At its core, § 230 bars "lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content."  *Zeran*, 129 F.3d at 330.  In *Zeran*, a case arising shortly after the enactment of the CDA, the panel considered a defamation claim against America Online (AOL) alleging "that AOL unreasonably delayed in removing defamatory messages posted by an unidentified third party, refused to post retractions of those messages, and failed to screen for similar postings thereafter."  *Id.* at 328.  The *Zeran* court explained that the CDA squarely barred this claim.  *See id.* at 330−35.

By barring publisher-liability and notice-liability defamation claims lodged against interactive computer service providers, § 230 serves three main purposes.  First, it "maintain[s] the robust nature of Internet communication and, accordingly, . . . keep[s] government interference in the medium to a minimum."  *Id.* at 330; *see also* 47 U.S.C. § 230(b)(2) ("It is the policy of the United States . . . to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation.").  Second, the immunity provided by § 230 protects against the "heckler's veto" that would chill free speech.  Without § 230, persons who perceive themselves as the objects of unwelcome speech on the internet could threaten litigation against interactive computer service

providers, who would then face a choice: remove the content or face litigation costs and potential liability. *See Zeran*, 129 F.3d at 331 ("The specter of tort liability in an area of such prolific speech would have an obvious chilling effect."). Immunity shields service providers from this choice. *See Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 254 (4th Cir. 2009) ("[I]mmunity is an immunity from suit rather than a mere defense to liability and . . . is effectively lost if a case is erroneously permitted to go to trial." (internal quotation marks omitted)). Third, § 230 encourages interactive computer service providers to self-regulate. An early internet case, *Stratton Oakmont*, held that at common law the provider of an electronic message-board service was potentially liable for its user's defamatory message because it had engaged in voluntary self-policing of the third-party content made available through its service. 1995 WL 323710, at *4. Section 230 set out to abrogate this precedent. *See* S. Rep. No. 104-230, at 194 (1996) ("One of the specific purposes of [§ 230] is to overrule *Stratton Oakmont v. Prodigy* and any other similar decisions . . . ."); *see also, e.g.*, *Zeran*, 129 F.3d at 331 ("Another important purpose of § 230 was to encourage service providers to self-regulate the dissemination of offensive material over their services. In this respect, § 230 responded to [*Stratton Oakmont*].").

The protection provided by § 230 has been understood to merit expansion. Congress has extended the protection of § 230 into new areas. *See* 28 U.S.C. § 4102(c)(1) (providing that U.S. courts "shall not recognize or enforce" foreign defamation judgments that are inconsistent with § 230); 47 U.S.C. § 941(e)(1) (extending § 230 protection to new class of entities). And courts have construed the immunity provisions in § 230 broadly. *See, e.g.*, *Nemet*, 591 F.3d at 254 (collecting cases). Moreover, "close cases . . . must be resolved in favor of immunity, lest we cut the heart out of section 230 by forcing websites to face death by ten thousand duck-bites, fighting off claims that they promoted or encouraged—or at least tacitly assented to—the illegality of third parties." *Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1174 (9th Cir. 2008) (en banc).

Section 230(c)(1)'s grant of immunity is not without limits, however.[3] It applies only to the extent that an interactive computer service provider is not also the information content provider of the content at issue. An "information content provider" is defined as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." 47 U.S.C. § 230(f)(3). A website operator can simultaneously act as both a service provider and a content provider. If a website displays content that is created entirely by third parties, then it is only a service provider with respect to that content—and thus is immune from claims predicated on that content. But if a website operator is in part responsible for the creation or development of content, then it is an information content provider as to that content—and is not immune from claims predicated on it. *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1123 (9th Cir. 2003) ("Under the statutory scheme, an 'interactive computer service' qualifies for immunity so long as it does not also function as an 'information content provider' for the portion of the statement or publication at issue."). Thus, a website may be immune from liability for some of the third-party content it publishes but be subject to liability for the content that it is responsible for as a creator or developer. *See Roommates*, 521 F.3d at 1162−63, 1165; *see also Batzel*, 333 F. 3d at 1033. In short, immunity under the CDA depends on the pedigree of the content at issue.

Aware of this limit on § 230 immunity, courts have recognized that § 230 bars a claim if (1) the defendant asserting immunity is an interactive computer service provider, (2) the particular information at issue was provided by another information content provider, and (3) the claim seeks to treat the defendant as a publisher or speaker of that information. *See, e.g.*, *Universal Commc'n Sys.*, 478 F.3d at 418. By contrast, a defendant is not entitled to protection from claims based on the publication of information if the defendant is "responsible, in whole or in part, for the creation or development of [the] information." 47 U.S.C. § 230(f)(3).

---

[3]Section 230(e) outlines a few exceptions, such as for claims under intellectual property laws. *See* 47 U.S.C. § 230(e)(2) ("Nothing in this section shall be construed to limit or expand any law pertaining to intellectual property."). These exceptions to § 230(c) immunity are inapplicable in this case.

C.

This case turns on how narrowly or capaciously the statutory term "development" in § 230(f)(3) is read.  The district court held, and Jones maintains on appeal, that Dirty World and Richie are not immune under the CDA because Dirty World and Richie are information content providers with respect to the information underlying Jones's defamation claims because they *developed* that information.  *See Jones IV*, 965 F. Supp. 2d at 823.  The district court set forth a test to measure whether a defendant is responsible for the development of the information grounding a plaintiff's state tort claim.  According to the district court, "a website owner who intentionally encourages illegal or actionable third-party postings to which he adds his own comments ratifying or adopting the posts becomes a 'creator' or 'developer' of that content and is not entitled to immunity." *Id.* at 821.  Dirty World and Richie argue that the district court's test of development is erroneous, swallowing the protection provided by § 230(c)(1) and undermining the purposes served by the CDA.  They maintain that, properly understood, they did not develop the statements forming the basis of Jones's defamation claims.

In our two opinions addressing the CDA, this court has neither expounded the meaning of "development" in § 230(f)(3) nor addressed the scope of immunity that § 230(c) provides.  *See Seaton*, 728 F.3d at 599 n.8; *Doe*, 551 F.3d at 416.  Nevertheless, drawing inferences from these cases, it is not difficult to identify an overly inclusive and exclusive reading of "development." An overly inclusive interpretation of "development" in § 230(f)(3) would posit that a website operator is responsible for the development of content created by a third party merely by displaying or allowing access to it.  *Cf. Roommates*, 521 F.3d at 1167 ("It's true that the broadest sense of the term 'develop' could include the functions of an ordinary search engine—indeed, just about any function performed by a website.").  But to read the term so broadly would defeat the purposes of the CDA and swallow the core immunity that § 230(c) provides for the "exercise of a publisher's traditional editorial functions."  *See Zeran*, 129 F.3d at 330; *see also Roommates*, 521 F.3d at 1167 (stating that "development" cannot be read to swallow § 230 immunity).  Our recognition that the CDA affords immunity forecloses this overbroad reading of "development."

By contrast, an overly exclusive interpretation of "development" would exclude all the publishing, editorial, and screening functions of a website operator from the set of actions that the term denotes. Some courts have implied this interpretation, however. *See, e.g.*, *Doe v. SexSearch.com*, 502 F. Supp. 2d 719, 727 (N.D. Ohio 2007), *aff'd*, 551 F.3d 412 (6th Cir. 2008). But we have refused to adopt it. *See Doe*, 551 F.3d at 415 ("[W]e do not reach the question of whether the [CDA] provides SexSearch with immunity from suit. We do not adopt the district court's discussion of the Act, which would read § 230 more broadly than any previous Court of Appeals decision has read it, potentially abrogating all state- or common-law causes of action brought against interactive Internet services."). We have maintained that, despite the CDA, *some* state tort claims will lie against website operators acting in their publishing, editorial, or screening capacities.

Therefore, limited circuit precedent suggests the proper interpretation of "*development* of information provided through the Internet," § 230(f)(3), means something more involved than merely displaying or allowing access to content created by a third party; otherwise § 230(c)(1) would be meaningless. And instances of development *may* include some functions a website operator may conduct with respect to content originating from a third party. *See SexSearch.com*, 551 F.3d at 415.

Beyond providing a basis to identify overly inclusive and exclusive interpretations of "development" in § 230(f)(3), our cases have not further illuminated the scope of the immunity furnished by the CDA. Decisions from our sister circuits, however, provide a workable measure of "development" that not only preserves the broad immunity the CDA provides for website operators' exercise of traditional publisher functions but also highlights the limited circumstances under which exercises of those functions are not protected. The leading case is *Roommates*. There, the Ninth Circuit sitting *en banc* discussed the meaning of "development" at length. *See* 521 F.3d at 1167−68. In *Roommates*, as a condition for using an online roommate-finding service, a website required each user seeking to offer living space to create a profile describing his desired roommate and, in so doing, required that user "to disclose his sex, sexual orientation and whether he would bring children to a household." *Id.* at 1161. The website also encouraged its users to provide additional comments describing themselves and their desired

roommate.  *Id.*  The fair housing councils of San Fernando Valley and San Diego sued, alleging that the website violated the Fair Housing Act and state housing discrimination laws.  *Id.* at 1162.  The court held that a website operator was not entitled to immunity with respect to allegedly unlawful content that it *required* its users to submit and with respect to the search engine that was built on that content.  *Id.* at 1165−68.  But the court also held that the website was immune as to claims based on the website's encouragement that users provide additional comments, some of which were alleged to be discriminatory.  *Id.* at 1173−75.  To arrive at these divergent holdings, the court applied a specific measure of development:

> [W]e interpret the term "development" as referring not merely to augmenting the content generally, but *to materially contributing to its alleged unlawfulness.*  In other words, a website helps to develop unlawful content, and thus falls within the exception to section 230, *if it contributes materially to the alleged illegality of the conduct*.

521 F.3d at 1167−68 (emphasis added).  A material contribution to the alleged illegality of the content does not mean merely taking action that is necessary to the display of allegedly illegal content.  Rather, it means being responsible for what makes the displayed content allegedly unlawful.  *Cf. Chicago Lawyers' Comm.*, 519 F.3d at 671 ("Causation . . . must refer to causing a particular statement to be made, or perhaps the discriminatory content of a statement.  That's the sense in which a non-publisher can cause a discriminatory ad, while one who causes the forbidden content may not be a publisher.").  "In an abundance of caution," the *Roommates* court gave several examples of applications of the "material contribution" test.  For example:

> If an individual uses an ordinary search engine to query for a "white roommate," the search engine has not contributed to any alleged unlawfulness in the individual's conduct; providing *neutral* tools to carry out what may be unlawful or illicit searches does not amount to "development" for purposes of the immunity exception.  A dating website that requires users to enter their sex, race, religion and marital status through drop-down menus, and that provides means for users to search along the same lines, retains its CDA immunity insofar as it does not contribute to any alleged illegality.

521 F.3d at 1169.  In contrast to this example, the court observed that Roommates required subscribers to disclose information about protected characteristics as a condition of accessing its service and "designed its search and email systems to limit the listings available to subscribers based on sex, sexual orientation and presence of children."  *Id.* at 1166, 1169.  Because

Roommates required information about protected characteristics and engineered its search and email systems to limit access to housing listings based on those protected characteristics, the court held that the website materially contributed to the alleged illegality of hiding certain listings. *See id.* at 1166−69, 1172.

The court also gave specific examples of the application of the material contribution test for a website that solicits, edits, and displays content originating from third parties (*i.e.*, a website akin to www.TheDirty.com). For example:

> A website operator who edits user-created content—such as by correcting spelling, removing obscenity or trimming for length—retains his immunity for any illegality in the user-created content, provided that the edits are unrelated to the illegality. However, a website operator who edits in a manner that contributes to the alleged illegality—such as by removing the word "not" from a user's message reading "[Name] did *not* steal the artwork" in order to transform an innocent message into a libelous one—is directly involved in the alleged illegality and thus not immune.

*Id.* at 1169 (alteration in original); *see also Batzel*, 333 F.3d at 1035 (holding that an editor of an email newsletter who received and published allegedly actionable information, adding a short headnote, was immune  under § 230 because an editor's changes to the length and spelling of third-party content do not contribute to the libelousness of the message). The *Roommates* court further explained:

> And any activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune under section 230. But if the editor publishes material that he does not believe was tendered to him for posting online, then he is the one making the affirmative decision to publish, and so he contributes materially to its allegedly unlawful dissemination. He is thus properly deemed a developer and not entitled to CDA immunity.

521 F.3d at 1170−71 (internal citations omitted).

Accordingly, the *Roommates* court held that § 230 barred the fair housing councils' claims grounded on the allegedly discriminatory statements displayed through Roommate's operation of the "additional comments" section of its website. *Id.* at 1173. The court explained:

> Roommate publishes these comments as written. It does not provide any specific guidance as to what the essay should contain, nor does it urge subscribers to input discriminatory preferences. Roommate is not responsible, in whole or in part, for

> the development of this content, which comes entirely from subscribers and is passively displayed by Roommate. Without reviewing every essay, Roommate would have no way to distinguish unlawful discriminatory preferences from perfectly legitimate statements. Nor can there be any doubt that this information was tendered to Roommate for publication online. This is precisely the kind of situation for which section 230 was designed to provide immunity.

*Id.* at 1173−74 (internal citation omitted). Furthermore, the court rejected the argument made by the fair housing councils that the website developed the allegedly illegal content displayed in the additional comments section because the website encouraged the submission of discriminatory preferences. *Id.* at 1174. The court reasoned that "[t]he fact that Roommate encourages subscribers to provide *something* in response to the prompt is not enough to make it a 'develop[er]' of the information." *Id.* (second alteration in original). Because "Roommate does not tell subscribers what kind of information they should or must include as 'Additional Comments,' and certainly does not encourage or enhance any discriminatory content created by users," the court held that the operation of the additional comments section did not materially contribute to the alleged unlawfulness of the content displayed on the website's comments section. *Id.*

The material contribution test has been adopted and applied by other circuits, with instructive effect. *Compare Nemet*, 591 F.3d at 257−58 (holding that a website *did not* contribute to alleged illegality), *with Accusearch*, 570 F.3d at 1200−01 (holding that a website *did* contribute to alleged illegality). In *Nemet*, Nemet, the owner of a Chevrolet dealership, sued Consumeraffairs.com, a website allowing users to comment on the quality of goods and services, after various allegedly tortious, third-party posts appeared on the website relating to automobiles sold or serviced by him. 591 F.3d at 252. The website claimed immunity under the CDA. Nemet responded that the website was, in fact, an information content provider under § 230(f)(3), and was thus liable as a co-developer, because of the "structure and design of its website" and because "Consumeraffiars.com solicit[ed] its customers' complaints [and] steered them into specific categor[ies]." *Id.* at 256 (first and third alterations in original) (quotation marks omitted). The panel affirmed the district court's grant of the website's motion to dismiss because "[e]ven accepting as true all of the facts Nemet pled as to Consumeraffairs.com's liability for the structure and design of its website, the amended complaint does not show, or

even intimate, that Consumeraffairs.com contributed to the allegedly fraudulent nature of the comments at issue." *Id.* at 257 (internal quotation marks omitted).

In *Accusearch*, Accusearch operated a website that sold the confidential information of individuals, including their telephone records, which the website paid researchers to obtain. 570 F.3d at 1190. The Federal Trade Commission brought suit against the website operator to curtail its sale of confidential information and to disgorge its profits from the sale of information in telephone records. *Id.* Accusearch claimed immunity under the CDA, arguing that it merely displayed the allegedly illegal conduct that originated from its third-party researchers. *Id.* The panel rejected this argument and held that the website operator developed the confidential telephone records within the meaning of the CDA. The panel cited *Roommates*'s material contribution test and found "[t]hat language applies to Accusearch's role in this case." *Id.* at 1200 (citing *Roommates*, 570 F.3d at 1168). The *Accusearch* panel reasoned that "[b]y paying its researchers to acquire telephone records, knowing that the confidentiality of the records was protected by law, it contributed mightily to the unlawful conduct of its researchers." *Id.* The panel noted that "the offensive postings were Accusearch's *raison d'etre* and it affirmatively solicited them." *Id.* It thus found that "Accusearch's actions were not 'neutral' with respect to generating offensive content; on the contrary, its actions were intended to generate such content." *Id.* at 1201. Accordingly, the panel held that "Accusearch is not entitled to immunity under the CDA." *Id.*

Other circuits, while not explicitly relying on *Roommates*'s material contribution test, have issued decisions consistent with it. *See, e.g.*, *Johnson*, 614 F.3d at 791 (holding that a website hosting company was immune to state tort claims grounded on unwelcome content posted to a client's website); *Chicago Lawyers' Comm.*, 519 F.3d at 671 (holding that craigslist.com was immune to fair housing claims based on discriminatory listings posted by third parties); *Green*, 318 F.3d at 471 (holding that AOL was immune to state tort claims grounded on third-party content); *Ben Ezra*, 206 F.3d at 984−85 (holding that defendant was immune to the defamation claim when it made its own editorial decisions with respect to third-party information published on its website); *Zeran*, 129 F.3d at 330−35.

D.

Consistent with our sister circuits, we adopt the material contribution test to determine whether a website operator is "responsible, in whole or in part, for the creation or development of [allegedly tortious] information." 47 U.S.C. § 230(f)(3). And we expressly decline to adopt the definition of "development" set forth by the district court.

The district court read the foregoing decisions, identified *Roommates* as the guiding precedent, but derived a different rule. In its memorandum opinion explaining the denial of Dirty World's and Richie's Rule 50 motion, the district court gave two formulations of a rule providing when the CDA does not bar a plaintiff's claim. First, the district court said that a "website owner who intentionally encourages illegal or actionable third-party postings to which he adds his own comments ratifying or adopting the posts becomes a 'creator' or 'developer' of that content and is not entitled to immunity." *Jones IV*, 965 F. Supp. 2d at 821. Second, in a different formulation, the district court said that "if . . . [website] owners, as in the instant case, invite invidious postings, elaborate on them with comments of their own, and call upon others to respond in kind, the immunity does not apply." *Id.* at 822. The district court arrived at these rules by over-reading the operative language contained in the analytic parts of *Johnson*, *Accusearh*, and *Chicago Lawyers' Committee*. *See id.* at 820 (finding that the *Johnson* "ruling was based on the fact that 'the record contains no evidence that [the internet service provider] designed its website to be a portal for defamatory material or [did] anything to induce defamatory postings'" (alterations in original) (quoting *Johnson*, 614 F.3d at 792)); *id.* (finding that the *Accusearch* court "held that one is not 'responsible' for 'developing' allegedly actionable information only 'if one's conduct was neutral with respect to the offensiveness of the content'" (quoting *Accusearch*, 570 F.3d at 1199); *id.* at 820 (finding that *Chicago Lawyers' Committee* "noted that '[n]othing in the service craigslist offers induces anyone to post any particular listing or express a preference for discrimination'" (alteration in original) (quoting *Chicago Lawyers' Comm.*, 519 F.3d at 671−72)). The district court read "inducement" to mean invitation and "neutral with respect to the offensiveness of the content" as a description of a website's orientation, not of a condition that users upload unlawful content, *cf. Roommates*,

521 F.3d at 1166−69, or that contractors conduct unlawful action, *cf. Accusearch*, 570 F.3d at 1200−01.

We do not adopt the district court's encouragement test of immunity under the CDA. The district court misapprehended how other circuits, particularly the Ninth Circuit in *Roommates*, have separated what constitutes "development" in § 230(f)(3) from what does not. The district court elided the crucial distinction between, on the one hand, taking actions (traditional to publishers) that are necessary to the display of unwelcome and actionable content and, on the other hand, responsibility for what makes the displayed content illegal or actionable. *See Roommates*, 521 F.3d at 1169−74. This is the distinction that divides the holdings in *Roommates* and *Accusearch*, which stripped the respective defendants of the CDA's protection, from the holdings in *Roommates*, *Chicago Lawyers' Committee*, *Johnson*, *Batzel*, *Nemet*, and *Zeran*, which barred the respective plaintiffs' claims. In *Roommates*, the website was responsible for the alleged discrimination by requiring users to submit protected characteristics and hiding listings based on those submissions. 521 F.3d at 1165−68. In *Accusearch*, the website was responsible for the illegal purchase and resale of confidential telephone records. 570 F.3d at 1200−01. But in *Chicago Lawyers' Committee*, 519 F.3d at 671−72, and *Nemet*, 591 F.3d at 256−57, for example, the website operators provided a forum for user posts, did not require users to violate the law as a condition of posting, did not compensate for the posting of actionable speech, did not post actionable content themselves, and therefore were not responsible for the actionable speech that was displayed on their websites. The district court's rule does not neatly divide these cases. An encouragement theory of "development" does not obviously capture what was allegedly unlawful about the design of Roommate's website, particularly its search engine, or Accusearch's payment for unlawful conduct. And it does not obviously leave out the neutral fora created by the commercially oriented websites targeted by the claims in *Chicago Lawyers' Committee* and *Nemet* (craigslist.com and www.consumeraffairs.com, respectively).

More importantly, an encouragement test would inflate the meaning of "development" to the point of eclipsing the immunity from publisher-liability that Congress established. Many websites not only allow but also actively invite and encourage users to post particular types of

content. Some of this content will be unwelcome to others—*e.g.*, unfavorable reviews of consumer products and services, allegations of price gouging, complaints of fraud on consumers, reports of bed bugs, collections of cease-and-desist notices relating to online speech. And much of this content is commented upon by the website operators who make the forum available. Indeed, much of it is "adopted" by website operators, gathered into reports, and republished online. Under an encouragement test of development, these websites would lose the immunity under the CDA and be subject to hecklers' suits aimed at the publisher. Moreover, under the district court's rule, courts would then have to decide what constitutes "encouragement" in order to determine immunity under the CDA—a concept that is certainly more difficult to define and apply than the Ninth Circuit's material contribution test. *See Zeran*, 129 F.3d at 333. Congress envisioned an uninhibited, robust, and wide-open internet, *see* § 230(a)(1)−(5), but the muddiness of an encouragement rule would cloud that vision. Accordingly, other courts have declined to hold that websites were not entitled to the immunity furnished by the CDA because they selected and edited content for display, thereby encouraging the posting of similar content. *See, e.g.*, *Roommates*, 521 F.3d at 1174 ("Such weak encouragement cannot strip a website of its section 230 immunity, lest that immunity be rendered meaningless as a practical matter."); *Batzel*, 333 F.3d at 1031. We do the same.

The district court also suggested that when an interactive computer service provider adds commentary to third-party content that "ratifies or adopts" that content, then the provider becomes a "creator" or "developer" of that content and is not entitled to the CDA's protection. *Jones IV*, 965 F. Supp. 2d at 821; *see also id.* at 823 ("Thus, Richie's conduct cannot be said to have been 'neutral with respect to the offensiveness of the content,' such that he is not 'responsible' for it within the meaning of 47 U.S.C. § 230(f)(3)."). An adoption or ratification theory, however, is not only inconsistent with the material contribution standard of "development" but also abuses the concept of responsibility. A website operator cannot be responsible for what makes another party's statement actionable by commenting on that statement *post hoc*. To be sure, a website operator's previous comments on prior postings could encourage subsequent invidious postings, but that loose understanding of responsibility collapses into the encouragement measure of "development," which we reject. *See, e.g.*, *Roommates*, 521 F.3d at 1174; *Batzel*, 333 F.3d at 1031. As other courts have recognized, the adoption

theory of "development" would undermine the CDA for the same reasons as an encouragement theory. *See Parisi v. Sinclair*, 774 F. Supp. 2d 310, 316 (D.D.C. 2011) (dismissing plaintiffs' claims as barred by the CDA despite their argument that defendant "adopted" the statements at issue as its own and finding that "it would be contrary to the purpose of the CDA, which sought to encourage the vibrant and competitive free market of ideas on the Internet, by establishing immunity for internet publication of third-party content to require a fact-based analysis of if and when a defendant adopted particular statements and revoke immunity on that basis" (internal citations and quotation marks omitted)).

### III.

We now apply the material contribution measure of "development" to the facts of this case. Jones's defamation claims target the statements that were posted by a third party on October 27 and December 7, 2009. Because Dirty World and Richie did not materially contribute to the illegality of those statements, the CDA bars Jones's claims. *See Nemet*, 591 F.3d at 260 (affirming dismissal where plaintiff failed to show defendant "was responsible for the creation or development of the allegedly defamatory content *at issue*" (emphasis added)).

Dirty World and Richie did not author the statements at issue; however, they did select the statements for publication. But Richie and Dirty World cannot be found to have materially contributed to the defamatory content of the statements posted on October 27 and December 7, 2009, simply because those posts were selected for publication. *See Batzel*, 333 F.3d at 1035 (holding that an editor of an email newsletter who received and published allegedly actionable information, adding a short headnote, was immune under § 230 because an editor's changes to the length and spelling of third-party content do not contribute to the libelousness of the message). Nor can they be found to have materially contributed to the defamatory content through the decision not to remove the posts. *See Zeran*, 129 F.3d at 330 (holding CDA immunity applied even though "AOL unreasonably delayed in removing defamatory messages posted by an unidentified third party, refused to post retractions of those messages, and failed to screen for similar postings thereafter"). The CDA expressly bars "lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content." *Id.*

Unlike in *Roommates*, the website that Richie operated did not require users to post illegal or actionable content as a condition of use. *Cf. Roommates*, 521 F.3d at 1165−68. Nor does the name of the website, www.TheDirty.com, suggest that only illegal or actionable content will be published. Unlike in *Accusearch*, Richie or Dirty World did not compensate users for the submission of unlawful content. *Cf. Accusearch*, 570 F.3d at 1200−01. The website's content submission form simply instructs users to "[t]ell us what's happening. Remember to tell us who, what, when, where, why." The form additionally provides labels by which to categorize the submission. These tools, neutral (both in orientation and design) as to what third parties submit, do not constitute a material contribution to any defamatory speech that is uploaded. *See Nemet*, 591 F.3d at 256 (finding that the "structure and design of [defendant's] website" and the website's "solicit[ion of] its customers' complaints [and] steer[ing] them into specific categor[ies]" did not constitute development under § 230(f)(3)" (fifth alteration in original) (internal quotation marks omitted)); *Roommates*, 521 F.3d at 1173−74 (holding that § 230 barred the fair housing councils' claims grounded on the discriminatory statements displayed through Roommate's operation of the "additional comments" section of its website).

Further, Richie's comment on the December 7 post—*viz.*, "Why are all high school teachers freaks in the sack?"—although absurd, did not materially contribute to the defamatory content of the statements uploaded on October 27 and December 7, 2009. Richie's remark was made after each of the defamatory postings had already been displayed. It would break the concepts of responsibility and material contribution to hold Richie responsible for the defamatory content of speech because he later commented on that speech. Although ludicrous, Richie's remarks did not materially contribute to the defamatory content of the posts appearing on the website. More importantly, the CDA bars claims lodged against website operators for their editorial functions, such as the posting of comments concerning third-party posts, so long as those comments are not themselves actionable. *See Zeran*, 129 F.3d at 330; *see also* 47 U.S.C. § 230(f)(3).

To be sure, Richie was an information content provider as to his comment on the December 7 post. But Jones did not allege that *Richie's* comments were defamatory. And the district court did not hold that Richie's comments were themselves tortious. Rather, the court

concluded that those comments "effectively ratified and adopted the defamatory third-party post" and thereby developed the defamatory statements, thus ruling that the CDA did not bar Jones's claims. *Jones IV*, 965 F. Supp. 2d at 823 ("Defendants are mistaken, for the salient point about Richie's tagline is not that it was defamatory itself and thus outside CDA immunity, but rather that it effectively ratified and adopted the defamatory third-party post."). The district court's adoption or ratification test, however, is inconsistent with the material contribution standard of "development" and, if established, would undermine the CDA. Therefore, Dirty World and Richie did not develop the statements forming the basis of Jones's tort claims and accordingly are not information content providers as to them.

Because (1) the defendants are interactive service providers, (2) the statements at issue were provided by another information content provider, and (3) Jones's claim seeks to treat the defendants as a publisher or speaker of those statements, the CDA bars Jones's claims. *See Universal Commc'n Sys.*, 478 F.3d at 418. Given the role that the CDA plays in an open and robust internet by preventing the speech-chilling threat of the heckler's veto, we point out that determinations of immunity under the CDA should be resolved at an earlier stage of litigation.[4] *See Nemet*, 591 F.3d at 254 ("[I]mmunity is an *immunity from suit* rather than a mere defense to liability [and] is effectively lost if a case is erroneously permitted to go to trial.").

## IV.

We note that the broad immunity furnished by the CDA does not necessarily leave persons who are the objects of anonymously posted, online, defamatory content without a remedy. In this case, Jones conceded that she did not attempt to recover from the person(s) whose comments Richie elected to publish. She conceded that she did not attempt to subpoena Richie or Dirty World to discover who authored the defamatory posts. Instead, she sued Dirty World and Richie. But, under the CDA, Jones cannot seek her recovery from the online publisher where that publisher did not materially contribute to the tortious content. Congress envisioned a free and open internet, *see* § 230(a)(1)−(5), and the immunity provision of § 230(c)(1), which subverts common-law publisher-liability, serves that purpose. While some

---

[4]Certification of the interlocutory appeal sought by Dirty World and Richie could have obviated the need for the second trial. An even earlier interlocutory appeal would have resolved the case prior to trial.

exercises of the considerable freedom that Congress allowed online publishers are regrettable, freedom and its uses are distinct. Congress enacted § 230(c)(1) to preserve a free internet, and that enactment resolves this case.

For the foregoing reasons, we vacate the judgment in favor of Jones and reverse the district court's denial of Dirty World's and Richie's motion for judgment as a matter of law with instructions to enter judgment as a matter of law in their favor.