The Ninth Circuit has held that the CDA "does not declare 'a general immunity from liability deriving from third-party content.' " Internet Brands , 824 F.3d at 852 (quoting Barnes v. Yahoo!, Inc ., 570 F.3d 1096, 1100 (9th Cir. 2009) ). Nor was it "meant to create a lawless no-man's land on the Internet." Roommates , 521 F.3d at 1164. Rather, " section 230(c)(1) protects from liability only (a) a provider or user of *1158 an interactive computer service (b) that the plaintiff seeks to treat as a publisher or speaker (c) of information provided by another information content provider." Fields v. Twitter, Inc. , 200 F.Supp.3d 964, 969 (N.D. Cal. 2016) (citing Barnes , 570 F.3d at 1100-01 ).
B. JASTA
Plaintiffs argue that JASTA repealed the immunity provisions of the CDA, rendering section 230(c)(1) inapplicable in this case. Congress enacted JASTA in September 2016. JASTA expanded the ATA by adding 18 U.S.C. § 2333(d), which provides that US nationals may assert liability against a person who aids and abets or conspires with a person who commits an act of international terrorism. JASTA also amended the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602 - 1611, to add a terrorism-related exception to the FSIA's grant of immunity to foreign states.
JASTA includes the following statement of purpose:
The purpose of this Act is to provide civil litigants with the broadest possible basis, consistent with the Constitution of the United States, to seek relief against persons, entities, and foreign countries, wherever acting and wherever they may be found, that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States.
JASTA § 2(b). According to Plaintiffs, JASTA is "a game-changer" that "nullifies" Google's motion, as it is a "much more recent expression of Congressional intent" than section 230(c)(1), which was enacted in 1996 and last amended in 1998. Opp'n 3-4. Plaintiffs argue that in light of Congress's expressed intent to provide justice to victims of international terrorism, JASTA repealed the protections provided by section 230(c)(1). Id. at 5.
Plaintiffs do not clearly state their theory of repeal. There are two kinds of statutory repeal, express and implied. "[A]n express repeal requires that Congress overtly state with specificity that the subsequent statute repeals a portion of the earlier statute." Patten v. United States , 116 F.3d 1029, 1033 (4th Cir. 1997) (quoting Gallenstein v. United States , 975 F.2d 286, 290 (6th Cir. 1992) ). Here, since JASTA does not specifically refer to section 230, it did not expressly repeal the protections set forth in the relevant portions of the CDA. See Moyle v. Dir., Office of Workers' Comp. Programs , 147 F.3d 1116, 1119 n.4 (9th Cir. 1998) (express repeal requires "reasonably certain identification of [the] affected act" (citation omitted)).
Although not clearly articulated by Plaintiffs, the court assumes that Plaintiffs' theory is that JASTA impliedly repealed section 230(c)(1). "It is a cardinal principle of statutory construction that repeals by implication are not favored." United States v. $493,850.00 in U.S. Currency , 518 F.3d 1159, 1167 (9th Cir. 2008) (quoting City & Cty. of S.F. v. Assessment Appeals Bd ., 122 F.3d 1274, 1276 (9th Cir. 1997) ). "An implied repeal will only be found where provisions in two statutes are in 'irreconcilable conflict,' or where the latter Act covers the whole subject of the earlier one and 'is clearly intended as a substitute.' " Branch v. Smith , 538 U.S. 254, 273, 123 S.Ct. 1429, 155 L.Ed.2d 407 (2003) (quoting Posadas v. Nat'l City Bank , 296 U.S. 497, 503, 56 S.Ct. 349, 80 L.Ed. 351 (1936) ); see also Radzanower v. Touche Ross & Co ., 426 U.S. 148, 155, 96 S.Ct. 1989, 48 L.Ed.2d 540 (1976) (statutes are in "irreconcilable conflict" when there is a "positive repugnancy between them or ... they cannot mutually coexist."). "[I]n either case, the intention of the legislature *1159 to repeal must be clear and manifest." Radzanower , 426 U.S. at 154, 96 S.Ct. 1989 (quoting Posadas , 296 U.S. at 503, 56 S.Ct. 349 ).
The second type of implied repeal is not at issue here, as JASTA did not cover the entire subject of the relevant portion of the CDA, which provides "[p]rotection for private blocking and screening of offensive material" that exists online. See 47 U.S.C. § 230. Accordingly, the court assumes that Plaintiffs' argument rests on a purported "irreconcilable conflict" between JASTA and the CDA. Courts analyzing whether an irreconcilable conflict exists between two statutes examine the language of the statutes as well as relevant legislative history. For example, in Moyle , the Ninth Circuit considered whether a Social Security Act ("SSA") garnishment provision impliedly repealed an anti-alienation provision of the Longshore and Harbor Workers' Compensation Act ("LHWCA") that Congress had enacted 48 years earlier. 147 F.3d at 1118-19. The court found that the two provisions were in irreconcilable conflict, because while the LHWCA anti-alienation provision, 33 U.S.C. § 916, prohibits garnishment of LHWCA benefits, the SSA garnishment provision permits garnishment of "moneys (the entitlement to which is based upon remuneration for employment) due from, or payable by, the United States ... to any individual." The SSA provision also defined "remuneration for employment" to include "worker's compensation benefits paid or payable under Federal or State law." Id . at 1120, 1121 (emphasis removed) (quoting 42 U.S.C. § 659(a), (h) ). The court examined the plain language of the SSA provision and its legislative history, which included a statement that the SSA provision "applies to ''payments under ... the Longshoremen's and Harbor Workers' Compensation Act (but only in cases where the payments are made by the United States)." Id . at 1121 (emphasis in original) (quotation omitted). It concluded that both the plain language and the legislative history of the statute "demonstrate[d] the legislature's 'clear and manifest' intent to repeal the LHWCA Anti-Alienation provision when it enacted the SSA Garnishment provision." Id . at 1124.
Here, Plaintiffs do not specifically identify any irreconcilable conflict between JASTA and the CDA in their opposition. See Opp'n 4, 17. Instead, they argue that JASTA's express statement of purpose is "to provide civil litigants with the broadest possible basis, consistent with the Constitution of the United States," to seek relief against those who provide material support to terrorists. Plaintiffs contend that this language conveys Congress's "clear expression that any other limitation on the Antiterrorism Act ... is abrogated," including every possible statutory immunity. [Docket No. 105 (July 27, 2017 Hr'g Tr.) 8-9.] According to Plaintiffs, Congress could have stated its intention that civil ATA claims should be given the "broadest possible" application "consistent with the Constitution and laws of the United States," but did not. Per Plaintiffs, this should be interpreted to mean that any existing immunity law, short of what may be in the Constitution itself, cannot bar an ATA claim. Opp'n 4 (emphasis in original); see also Hr'g Tr. 9. Plaintiffs' indirect repeal argument rests solely on the phrase "consistent with the Constitution of the United States" contained in JASTA's statement of purpose. They do not offer any legislative history or other support for their sweeping argument that JASTA expresses Congress's intent to abrogate all statutory immunities for ATA claims, including section 230.
Plaintiffs' argument is not well taken. JASTA does not reference any portion of the CDA either directly or indirectly, nor does it address the responsibilities of or *1160 protections for interactive computer service providers. JASTA thus evinces no "clear and manifest" congressional intent to repeal any part of the CDA. In contrast, JASTA expressly amended the FSIA to modify the immunity provision of that particular statute. FSIA provides, "with specified exceptions, that a 'foreign state shall be immune from the jurisdiction of the courts of the United States and of the States.' " Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co. , --- U.S. ----, 137 S.Ct. 1312, 1316, 197 L.Ed.2d 663 (2017) (quoting 28 U.S.C. § 1604 ). JASTA modified the FSIA to add 28 U.S.C. § 1605B, which allows claims for damages against foreign states in any case "in which money damages are sought against a foreign state for personal injury or death occurring in the United States" caused by "the tortious act or omission of that foreign state" on U.S. soil. See 28 U.S.C. § 1605B(b) ; JASTA § 3(a) (adding 28 U.S.C. § 1605B, "Responsibility of foreign states for international terrorism against the United States"). Under this provision, victims of terrorism in the United States can bring claims against foreign states regardless of whether they were designated as a "state sponsor of terrorism" at the time of the terrorist act. Compare 28 U.S.C. § 1605B(b)with 28 U.S.C. § 1605A(a)(2)(A)(i)(I) (requiring that foreign state have been designated as a state sponsor of terrorism at the time of the act "or was so designated as a result of such act"). This demonstrates that where Congress intended JASTA to repeal existing statutory immunities, it made that clear.
Plaintiffs did not provide an analysis of JASTA's legislative history, and the court's own review did not reveal any support for Plaintiffs' far-reaching interpretation. The legislative history contains no evidence that Congress contemplated that JASTA would abrogate any statutory immunities other the immunity afforded by the FSIA. Instead, JASTA's history, including statements by members of Congress, reflects Congress's clear intent to provide an exception to the FSIA's presumptive immunity for foreign states in order "to hold foreign sponsors of terrorism that target the United States accountable in Federal courts." See 160 Cong. Rec. S6657-01, 2014 WL 7001951, at *S6659 (Dec. 11, 2014). As JASTA co-sponsoring Senators Charles Schumer and John Cornyn explained, the purpose of JASTA was to close a "loophole" in the FSIA that resulted in the dismissal of claims by the family members of the victims of the September 11, 2001 attacks in New York against foreign entities that allegedly funded the attacks. See id. ; see also 162 Cong. Rec. S2845-01, 2016 WL 2888818, at *S2845 (May 17, 2016) (explaining legislation would enable "Americans and their family members who lost loved ones on [September 11, 2011] to pursue their claims for justice against those who sponsored those acts of terrorism on U.S. homeland."). The discussion of the provision of JASTA that amended the ATA was fairly limited, and nothing in the legislative history supports the conclusion that Congress sought to eliminate all forms of statutory immunity in terrorism-related cases.[3]
It is also worth noting that Plaintiffs' argument relies not on the substantive provisions of JASTA, but on uncodified language setting forth its statement of purpose. See JASTA § 2(b). It is well settled that prefatory clauses or statements *1161 of purpose do not change the plain meaning of an operative clause. See Kingdomware Techs., Inc. v. United States , --- U.S. ----, 136 S.Ct. 1969, 1977, 195 L.Ed.2d 334 (2016) (citing Yazoo & M.V.R. Co. v. Thomas , 132 U.S. 174, 188, 10 S.Ct. 68, 33 L.Ed. 302 (1889) ); see also Hawaii v. Office of Hawaiian Affairs , 556 U.S. 163, 173-76, 129 S.Ct. 1436, 173 L.Ed.2d 333 (2009) (holding that preambular "whereas" clauses did not create substantive rights, and emphasizing that "repeals by implication are not favored and will not be presumed unless the intention of the legislature to repeal [is] clear and manifest."). In short, JASTA's statement of purpose "cannot bear the weight" that Plaintiffs place on it. See Hawaii , 556 U.S. at 175, 129 S.Ct. 1436.
The court concludes that JASTA did not repeal section 230(c)(1).
C. Extraterritorial Application of Section 230(c)(1)
Plaintiffs also argue that section 230(c)(1) immunity does not arise because the CDA does not apply outside the territorial jurisdiction of the United States. According to Plaintiffs, Google provided support and resources to ISIS outside the United States, in Europe and the Middle East; ISIS's use of Google's resources was outside the United States; and the Paris attacks and Gonzalez's death took place outside the United States. Therefore, Plaintiffs argue, Google may not rely on section 230(c)(1). Opp'n 19.
The "presumption against extraterritoriality" of United States law mandates that "[a]bsent clearly expressed congressional intent to the contrary, federal laws will be construed to have only domestic application." RJR Nabisco, Inc. v. European Cmty. , --- U.S. ----, 136 S.Ct. 2090, 2100, 195 L.Ed.2d 476 (2016) (citing Morrison v. Nat'l Australia Bank Ltd. , 561 U.S. 247, 255, 130 S.Ct. 2869, 177 L.Ed.2d 535 (2010) ). Courts must use a "two-step framework for analyzing extraterritoriality issues." Id . at 2101. First, the court must determine "whether the presumption against extraterritoriality has been rebutted-that is, whether the statute gives a clear, affirmative indication that it applies extraterritorially." Id ."If the statute is not extraterritorial, then at the second step [courts] determine whether the case involves a domestic application of the statute ... by looking to the statute's 'focus,' " id ., defined as the "objects of the statute's solicitude." Morrison , 561 U.S. at 267, 130 S.Ct. 2869. "If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad; but if the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory." RJR Nabisco , 136 S.Ct. at 2101.
At step one, the court agrees with Plaintiffs that the CDA does not contain "a clear, affirmative indication that it applies extraterritorially." Id . Therefore, the court must determine at step two whether this case involves a domestic application of the CDA. To do so, the court must determine whether the conduct relevant to the statute's focus occurred in the United States or abroad. Id.
The court in Cohen v. Facebook, Inc. , 252 F.Supp.3d 140, 157-61, Nos. 16-CV-4453 (NGG) (LB), 16-CV-5158 (NGG) (LB), 2017 WL 2192621, at *13-15 (E.D.N.Y. May 18, 2017), recently examined the exact question presented here, that is, whether section 230(c)(1) can be applied to conduct occurring outside of the United States. Cohen examined the statute under the RJR Nabisco /Morrison framework. Considering the text and context of *1162 section 230(c)(1), it determined that the focus of section 230(c)(1)'s solicitude is "its limitation on liability." Id . at 159, at *14. The Cohen court noted that "[s]ection 230(c)(1) offers only one directive-that qualifying defendants may not be treated as the 'publisher or speaker of any' third party content-which it does not cabin based on either the location of the content provider or the user or provider of the interactive computer service." Id . (citing 47 U.S.C. § 230(c)(1) ). Applying relevant Second Circuit law, Cohen then assessed the "relevant territorial events and relationships that bear on that focus," considering whether those events and relationships "occurred domestically or abroad with respect to the challenged application of the statute." Id . at 159, at *13 (quoting Matter of a Warrant to Search a Certain E-Mail Account Controlled & Maintained by Microsoft Corp ., 829 F.3d 197, 216 (2d Cir. 2016) ). Cohen concluded that in light of section 230(c)(1)'s focus on limiting civil liability, "the relevant location is that where the grant of immunity is applied, i.e. the situs of the litigation." Id . at 160, at *15. Specifically, the court found that "[g]iven the statutory focus on limiting liability, ... the location of the relevant 'territorial events' or 'relationships' cannot be the place in which the claims arise but instead must be where redress is sought and immunity is needed," i.e., in the United States. Id.
The court agrees with Cohen that the focus of section 230(c)(1) is "limiting civil liability." See id . at 160, at *15.[4] In enacting section 230, Congress "chose[ ] to treat cyberspace differently" from information providers such as newspapers, magazines, and television and radio stations, "all of which may be held liable for publishing or distributing obscene or defamatory material written or prepared by others." Batzel , 333 F.3d at 1026-27 (quotation omitted). Congress made this choice for two primary reasons: "to encourage the unfettered and unregulated development of free speech on the Internet, and to promote the development of e-commerce," and "to encourage interactive computer services and users of such services to self-police the Internet for obscenity and other offensive material, so as to aid parents in limiting their children's access to such material." Id . at 1027-28 ; see also 47 U.S.C. § 230(a)(4) ("[t]he Internet and other interactive computer services have flourished, to the benefit of all Americans, with a minimum of government regulation."). To those ends, the only substantive provisions of section 230 are section 230(c), *1163 which gives providers and users of interactive computer services two types of protection from civil liability, and section 230(d), which requires interactive computer service providers to notify customers of commercially available parental control protections. As the court in Cohen recognized, the immunities in section 230(c)"were adopted specifically for the purpose of clarifying-and curtailing-the scope of internet-providing defendants' exposure to liability predicated on third party content, and much of the surrounding statutory language emphasizes and supports this focus." 252 F.Supp.3d 140, 2017 WL 2192621, at *14 ; see also Zeran v. Am. Online, Inc. , 129 F.3d 327, 330-31 (4th Cir. 1997) (" Section 230 was enacted, in part, to maintain the robust nature of Internet communication and, accordingly, to keep government interference in the medium to a minimum.... Congress made a policy choice ... not to deter harmful online speech through the separate route of imposing tort liability on companies that serve as intermediaries for other parties' potentially injurious messages."). In other words, the immunities in section 230(c) are far from tangential; they are one of the means by which Congress "sought to further First Amendment and e-commerce interests on the Internet while also promoting the protection of minors." Batzel , 333 F.3d at 1028.
Given section 230's focus on limiting civil liability, the location of the conduct relevant to that focus "must be where redress is sought and immunity is needed," Cohen , 252 F.Supp.3d at 160, 2017 WL 2192621, at *15, i.e., through this litigation, which is in this district. Accordingly, the court rejects Plaintiffs' claim that Google may not invoke section 230(c)(1)'s immunity on the ground that it requires extraterritorial application of the statute.[5]
The court now turns to the question of whether section 230(c)(1) immunity applies to Plaintiffs' claims.
D. Immunity Under Section 230(c)(1)
Google argues that section 230(c)(1) blocks all of Plaintiffs' claims. As noted, section 230(c)(1) protects from liability "(a) a provider or user of an interactive computer service (b) that the plaintiff seeks to treat as a publisher or speaker (c) of information provided by another information content provider." Fields , 200 F.Supp.3d at 969. Google argues that this test is satisfied here, because Google is a provider of interactive computer services, Plaintiffs' claims seek to treat Google as a publisher, and the content at issue-ISIS videos-was provided by third parties.
Plaintiffs do not dispute that Google is an interactive computer service provider.
*1164 However, they argue that the second and third elements of section 230(c)(1) immunity are not met, because they do not seek to treat Google as a publisher or speaker, and the information at issue was provided by Google rather than another information content provider.
1. Whether Plaintiffs Seek to Treat Google as a Publisher or Speaker
Google argues that it is entitled to section 230(c)(1) immunity because Plaintiffs' claims seek to hold Google liable as the "publisher or speaker" of ISIS's YouTube videos. Plaintiffs counter that their lawsuit does not depend on the characterization of Google as the publisher or speaker of ISIS's content, because their claims focus on Google's violations of the ATA and federal criminal statutes that bar the provision of material support to terrorists. Opp'n 18.
The Ninth Circuit has instructed that in examining whether section 230(c) immunity applies to a particular claim, "what matters is not the name of the cause of action-defamation versus negligence versus intentional infliction of emotional distress-what matters is whether the cause of action inherently requires the court to treat the defendant as the 'publisher or speaker' of content provided by another." Barnes , 570 F.3d at 1101-02. While "the cause of action most frequently associated with the cases on section 230 is defamation, ... the language of the statute does not limit its application to defamation cases." Id. at 1101 (citations omitted). "[C]ourts must ask whether the duty that the plaintiff alleges the defendant violated derives from the defendant's status or conduct as a 'publisher or speaker.' If it does, section 230(c)(1) precludes liability." Id . at 1102. "This guidance emphasizes that Section 230(c)(1) is implicated not only by claims that explicitly point to third party content but also by claims which, though artfully pleaded to avoid direct reference, implicitly require recourse to that content to establish liability or implicate a defendant's role, broadly defined, in publishing or excluding third party [c]ommunications." Cohen , 252 F.Supp.3d at 156, 2017 WL 2192621, at *11 (discussing FTC v. LeadClick Media, LLC , 838 F.3d 158, 175 (2d Cir. 2016) (quoting Barnes , 570 F.3d at 1102 )).
Here, the SAC alleges that Google "knowingly provided" ISIS with access to YouTube, allowing it to use the platform and services "as a powerful tool for terrorism" by permitting it to post videos to spread propaganda, recruit followers, and plan and carry out attacks. SAC ¶¶ 12, 13, 21. Plaintiffs further allege that Google "refuse[d] to actively identify ISIS YouTube accounts" or to make "substantial or sustained efforts to ensure that ISIS would not re-establish the accounts using new identifiers." Id . at ¶¶ 20, 427, 429. According to Google, Plaintiffs' theory is that "Google permitted third parties to publish harmful material on its service and failed to do enough to remove that content and the users responsible for posting it." Mot. 12. This theory, Google argues, targets its " 'traditional editorial functions'-decisions regarding 'whether to publish, withdraw, postpone, or alter content.' " Mot. 12 (quoting Jones v. Dirty World Entm't Recordings LLC , 755 F.3d 398, 416 (6th Cir. 2014) ). Google contends that these functions are "precisely the kind of activity for which Congress intended to grant absolution with the passage of section 230." Roommates , 521 F.3d at 1171-72 ("any activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune under section 230."); Batzel , 333 F.3d at 1031 ("the exclusion of 'publisher' liability necessarily precludes liability for exercising the usual prerogative of publishers to choose among proffered material").
*1165 In response, Plaintiffs deny that their claims are dependent upon content posted by ISIS or its operatives. They argue that their claims are based upon the fact that Google provides ISIS followers with access to powerful tools and equipment to publish their own content. These tools include expert assistance, communications equipment, and personnel. Opp'n 18. Plaintiffs assert that they challenge Google's provision of the means for ISIS followers to self-publish content, rather than challenging the actual content itself.
This argument essentially tries to divorce ISIS's offensive content from the ability to post such content. However, Plaintiffs' parsing of means and content is utterly inconsistent with their allegations in the SAC. Plaintiffs do not allege that they have been harmed by the mere provision of the YouTube platform to ISIS. Instead, they allege that "ISIS uses YouTube as a tool and a weapon of terrorism," and that ISIS recruits, plans, incites, instructs, threatens, and communicates its terror message on YouTube. SAC ¶¶ 148, 150. The SAC is replete with detailed descriptions of the actual content that ISIS has posted on YouTube in furtherance of its terrorist activity, including over 15 pages of allegations of "ISIS's extensive use of Google's services" to disseminate its terrorist message. SAC 23-40. In this way, Plaintiffs' claims are inextricably bound up with the content of ISIS's postings, since their allegations describe a theory of liability based on the "essential" role that YouTube has played "in the rise of ISIS to become the most feared terrorist organization in the world." Id . at ¶¶ 139, 238 ("Google's Services have played an essential role in enabling ISIS to grow, develop, and project itself as the most feared terrorist organization in the world.").
Moreover, like the plaintiffs in Cohen , Plaintiffs "rely on content to establish causation," thus undercutting their argument that their claims do not seek to treat Google as a publisher of information. See Cohen , 252 F.Supp.3d at 157-59, 2017 WL 2192621, at *13. Plaintiffs' claims are not premised solely on the theory that Google provided a publishing or communication platform to ISIS; they are further grounded in the allegation that Google failed to prevent ISIS from using YouTube to transmit its hateful message, which resulted in great harm. See SAC at ¶¶ 139, 147, 245 ("YouTube enables ISIS to communicate its messages directly to intended audiences"; YouTube enabled ISIS "to facilitate and accomplish" the Paris attacks). As the Cohen court observed, Google's "role in publishing that content is thus an essential causal element" of Plaintiffs' claims, and "allowing liability to be imposed on that basis would 'inherently require[ ] the court to treat the defendant as the publisher or speaker of content provided by' " ISIS. 252 F.Supp.3d at 158, 2017 WL 2192621, at *13. If the court were to apply Plaintiffs' logic and ignore the content of any ISIS-related YouTube postings in construing Plaintiffs' claims, it would be impossible to discern a causal basis for Google's alleged responsibility for the terrorist attacks.
Plaintiffs' "means rather than content" argument is nearly identical to the one advanced in Fields , where the plaintiffs asserted that their claims were not based on the contents of tweets or the failure to remove tweets, but were instead based on "Twitter's 'provision of Twitter accounts to ISIS in the first place.' " 200 F.Supp.3d at 970 ; Fields v. Twitter , 217 F.Supp.3d 1116, 1120 (N.D. Cal. 2016) (" Fields II "). The Fields court rejected this argument, holding that "providing accounts to ISIS is publishing activity, just like monitoring, reviewing, and editing content." Fields II , 217 F.Supp.3d at 1123. It noted that "[a] policy that selectively prohibits ISIS members from opening accounts would necessarily *1166 be content based as Twitter could not possibly identify ISIS members without analyzing some speech, idea or content expressed by the would-be account holder: i.e., 'I am associated with ISIS.' " Id . Like the plaintiffs in Fields , Plaintiffs in this case attempt to penalize a publishing decision by imposing liability on Google for failing to prevent ISIS followers from using YouTube. The alleged wrongdoing challenged by Plaintiffs is "the decision to permit third parties to post content." Fields , 200 F.Supp.3d at 972. As such, Plaintiffs seek to treat Google as the publisher of ISIS's video content.
Plaintiffs offer a second argument to support their position that they are not suing Google in its capacity as a publisher or speaker of third party content. This contention is based on the "functionality" that Google provides to YouTube users. Plaintiffs argue that Google provides proprietary functions that are not "traditional publishing" activities. These functions enhance ISIS's ability to conduct operations; they include allowing accounts that are taken down to rapidly "reconstitute" by permitting bulk friend/follow requests, and failing to take steps to minimize or mitigate "incremental naming" of accounts. Opp'n 20-21. Plaintiffs assert that the use of these functions is "suspicious conduct that is easily detectable and prevented by Google." Id . at 21 (emphasis in original); see also Hr'g Tr. 41. According to Plaintiffs, placing limitations on this conduct is not content-specific, and therefore, does not implicate Google's role as a publisher of content.
This argument, too, fails, because it seeks to impose liability on Google for allowing users to reconstitute or recreate accounts which Google has already chosen to disable. As the Ninth Circuit has recognized, this is precisely the result Congress sought to avoid when it enacted section 230 and provided protection for websites "against the evil of liability for failure to remove offensive content":
Section 230 was prompted by a state court case holding Prodigy responsible for a libelous message posted on one of its financial message boards. See Stratton Oakmont, Inc. v. Prodigy Servs. Co., 1995 WL 323710 (N.Y.Sup.Ct. May 24, 1995) (unpublished). The court there found that Prodigy had become a "publisher" under state law because it voluntarily deleted some messages from its message boards "on the basis of offensiveness and 'bad taste,' " and was therefore legally responsible for the content of defamatory messages that it failed to delete. Id. at *4. The Stratton Oakmont court reasoned that Prodigy's decision to perform some voluntary self-policing made it akin to a newspaper publisher, and thus responsible for messages on its bulletin board that defamed third parties. The court distinguished Prodigy from CompuServe, which had been released from liability in a similar defamation case because CompuServe "had no opportunity to review the contents of the publication at issue before it was uploaded into CompuServe's computer banks." Id. ; see Cubby, Inc. v. CompuServe, Inc. , 776 F.Supp. 135, 140 (S.D.N.Y. 1991). Under the reasoning of Stratton Oakmont, online service providers that voluntarily filter some messages become liable for all messages transmitted, whereas providers that bury their heads in the sand and ignore problematic posts altogether escape liability. Prodigy claimed that the "sheer volume" of message board postings it received-at the time, over 60,000 a day-made manual review of every message impossible; thus, if it were forced to choose between taking responsibility for all messages and deleting no messages at all, it would have to choose the latter course. Stratton Oakmont, 1995 WL 323710 at *3.
*1167 Roommates , 521 F.3d at 1163, 1174. The Ninth Circuit explained that in enacting section 230, "Congress sought to spare interactive computer services this grim choice by allowing them to perform some editing on user-generated content without thereby becoming liable for all defamatory or otherwise unlawful messages that they didn't edit or delete." Id ."In other words, Congress sought to immunize the removal of user-generated content, not the creation of content ..." Id . (emphasis in original). Under Plaintiffs' theory, Google would be penalized for the act of policing YouTube by removing problematic or ISIS-related accounts that users are then able to immediately regenerate.[6] This "policing" falls within the purview of a publisher.
Notably, the court in Cohen rejected a similar theory asserted by the plaintiffs, who sought to hold Facebook liable for " 'provision of services' to Hamas in the form of account access 'coupled with Facebook's refusal to use available resources ... to identify and shut down Hamas [ ] accounts.' " 252 F.Supp.3d at 157, 2017 WL 2192621, at *12. The court held that "[w]hile superficially content-neutral, this attempt to draw a narrow distinction between policing accounts and policing content must ultimately be rejected. Facebook's choices as to who may use its platform are inherently bound up in its decisions as to what may be said on its platform, and so liability imposed based on its failure to remove users would equally 'derive[ ] from [Facebook's] status or conduct as a 'publisher or speaker.' " Id . (quoting LeadClick , 838 F.3d at 175 ). This court agrees with the reasoning in Cohen . Plaintiffs seek to hold Google liable for failing to adopt a strategy to defeat activity such as account reconstitution and bulk friend/follow requests; to the extent the objective of such a strategy is to control who can publish content, section 230(c)(1) immunizes Google's decision not to adopt that strategy. The Ninth Circuit has made clear that "any activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune under section 230." Roommates , 521 F.3d at 1170-71 ; see also Doe v. MySpace, Inc. , 528 F.3d 413, 420 (5th Cir. 2008) ("decisions relating to the monitoring, screening, and deletion of content ... [are] actions quintessentially related to a publisher's role." (quotation omitted)).
For the reasons above, the court concludes that Plaintiffs' claims seek to treat Google as the publisher or speaker of ISIS's YouTube videos.
2. Whether Google Is an Information Content Provider
Finally, Google argues that it is not an "information content provider" because third parties created and posted the offending content at issue on YouTube, and not Google. The CDA defines "information content provider" as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." 47 U.S.C. § 230(f)(3). While a website operator like Google can be both an "interactive computer service" and an "information content provider," Roommates , 521 F.3d at 1162, "[t]he critical issue is whether ... [the interactive computer service] acts as an information content provider with respect *1168 to the information" at issue. Carafano v. Metrosplash.com, Inc. , 339 F.3d 1119, 1125 (quotation omitted).
Plaintiffs argue that Google acts as an "information content provider" by placing targeted ads. According to Plaintiffs, Google selects an ad to be displayed alongside user content based on information it gathers about the viewer and the posting, thus creating "new unique content" in the form of a composite page for specific viewers. FAC ¶¶ 460-461. This specifically-created content is intended "to capture [a viewer's] attention" and keep the viewer on the page longer. Hr'g Tr. 58. In this way, Plaintiffs assert, Google's conduct exceeds the scope of immunity provided by section 230(c)(1), because Google thereby "enters into the unprotected world of content creators." Opp'n 23.
This theory finds no support in the case law. In Roommates , which is controlling Ninth Circuit authority, the court interpreted the term "development" as used in the section 230(f)(3) definition of "information content provider" "as referring not merely to augmenting the content generally, but to materially contributing to its alleged unlawfulness." 521 F.3d at 1167-68. "In other words, a website helps to develop unlawful content, and thus falls within the exception to section 230 [immunity], if it contributes materially to the alleged illegality of the conduct." Id . at 1168. In Jones , 755 F.3d at 410, the Sixth Circuit adopted the definition of "development" from Roommates and held that "[a] material contribution to the alleged illegality of the content does not mean merely taking action that is necessary to the display of allegedly illegal content. Rather, it means being responsible for what makes the displayed content allegedly unlawful."
Here, Plaintiffs do not allege that Google "materially contribut[ed]" in any way to the actual content of ISIS's YouTube videos. They do not claim that Google's ads (which are themselves third-party content) are objectionable, or that the ads played any role in making ISIS's terrorist videos unlawful. For example, Plaintiffs do not allege that any ads paired with ISIS-related content offered tools or instructions on how to carry out ISIS's threats, or otherwise encouraged individuals to commit acts of terrorism. The SAC contains only one screenshot example of an alleged targeted ad next to an ISIS video on YouTube; the screenshot shows an advertisement for a product called "ThreatMetrix Cybercrime Report: Q4 2015." SAC ¶ 458. Plaintiffs do not make any allegations about the relationship between this product and terrorism. See, e.g., Jones , 755 F.3d at 416-17 (holding interactive service provider was not information content provider as to allegedly defamatory third party posts; even though provider appended his own comments to the posts, the plaintiff did not allege that the provider's comments were themselves defamatory).
Nor do Plaintiffs suggest that Google's targeted ad algorithm is anything but content neutral. Notably, the court in Roommates distinguished between a website that merely provides "neutral tools" that may be used by third parties to post unlawful content, and a website that "both elicits the allegedly illegal content and makes aggressive use of it in conducting its business." 521 F.3d at 1171-72. The court held that a search engine's provision of "neutral tools to carry out what may be unlawful or illicit searches does not amount to 'development' for purposes of the immunity exception." Id . at 1169. So too here. Google's provision of neutral tools, including targeted advertising, does not equate to content development under section 230, because as currently alleged, the tools do not encourage the posting of unlawful or objectionable material. See id . at 1171-72.
*1169 At the hearing, Plaintiffs suggested for the first time that the Roommates "material contribution" test does not apply because the Roommates court was not considering the exact question presented here, which is whether targeted advertising is a form of content development. Hr'g Tr. 59-60. Plaintiffs assert that the issue of "strategically combining third party content" presents a matter of first impression, and that "precedent supports a conclusion that Google's actions [in targeting ads] overstep traditional editorial and publishing functions." Opp'n 23. In support, Plaintiffs cite MCW, Inc. v. Badbusinessbureau.com, L.L.C ., No. Civ.A.3:02-CV-2727-G, 2004 WL 833595 (N.D. Tex. Apr. 19, 2004). However, the facts of that case bear little resemblance to Google's alleged actions here. In MCW , the website at issue was a consumer complaint forum. The defendants, one of which operated the website, did not dispute that they "themselves create[d], develop[ed], and post[ed] original, defamatory information" regarding the plaintiff, nor did they dispute that they "personally [wrote] and create[d] numerous disparaging and defamatory messages about [the plaintiff] in the form of report titles and various headings," such as "Con Artists," "Scam," "Ripoff," and "Corrupt Companies." Id . at *9, n.11. Additionally, the defendants actively encouraged a consumer to take certain photos depicting the plaintiff's company name so that they could be included on the website. Id . at *10. Based on these facts, the court concluded that the defendant website had acted as an "information content provider" with respect to some of the defamatory information on their site and could not claim § 230(c)(1) immunity. Id . In contrast with the defendant in MCW , Plaintiffs do not allege that Google created any content that was itself objectionable or unlawful.
Plaintiffs provide no support for their position that Roommates does not apply here. The rule announced in Roommates , that a website operator is responsible for creating or developing content within the meaning of section 230(f)(3) if it "materially contribut[es] to [the content's] alleged unlawfulness," 521 F.3d at 1167-68, was not limited to the facts of that case. Courts have applied the material contribution test in various factual scenarios. For example, the Sixth Circuit's 2014 decision in Jones is instructive. In Jones , the court adopted and applied the Roommates test to determine whether the operator of an interactive service provider was a content developer under section 230(f)(3) where he selected allegedly defamatory statements for online publication, appended commentary to the postings, and refused to remove them upon request. 755 F.3d at 415-16. The court observed that the "crucial distinction" for determining what constitutes "development" in section 230(f)(3) is "on the one hand, taking actions (traditional to publishers) that are necessary to the display of unwelcome and actionable content and, on the other hand, responsibility for what makes the displayed content illegal or actionable." Id . at 414. It concluded that the defendant was an information content provider as to his own comments, but that his comments, which were not themselves challenged as defamatory, did not materially contribute to the defamatory content of the challenged statements. Id . at 416-17. It also noted that the defendant's provision of neutral tools for third parties to use to submit information did not constitute a material contribution to any defamatory speech that had been uploaded by third parties. Id . at 416 ; see also id . at 412-13 (discussing cases adopting and applying material contribution test). As with the interactive service provider's own commentary in Jones , Plaintiffs do not allege that Google's own actions-here, its targeted ad algorithm-contribute in any way to what makes the ISIS-related videos unlawful or objectionable.
*1170 Google's ad pairings do nothing to enhance the unlawfulness of ISIS videos, encourage the posting of ISIS videos, or make posting ISIS videos easier. See Roommates , 521 F.3d at 1172 (discussing Carafano , 339 F.3d at 1124 ).
Plaintiffs also argue that by sharing advertising revenue with ISIS, Google is directly contributing to ISIS's unlawful activities. Opp'n 24. Their argument on this point appears to be that by "paying ISIS" for its videos, Google is responsible for developing and generating ISIS content. See id . The case that Plaintiffs cite in support is distinguishable. In FTC v. Accusearch, Inc ., 570 F.3d 1187, 1200 (10th Cir. 2009), the FTC sued a website operator that sold personal data online, including telephone records which are protected from disclosure under federal law. Id . at 1190. The defendant asserted section 230(c)(1) immunity, stressing that its search services were provided by third-party researchers. Id . at 1191. The court held that the defendant was not entitled to immunity because it was an information content provider. The court noted that the defendant "solicited requests for ... confidential information and then paid researchers to obtain it" with the knowledge that "its researchers were obtaining the information through fraud or other illegality." Id . at 1199. Based on these actions, the court held that the defendant "contributed mightily to the unlawful conduct of its researchers," and that "the offensive postings were [the defendant's] raison d'etre and it affirmatively solicited them." Id . at 1200. It concluded that "[t]he offending content was the disclosed confidential information itself," and that the defendant "was responsible for the development of that content-for the conversion of the legally protected records from confidential material to publicly exposed information." Id . at 1199. Unlike the defendant in Accusearch , the SAC does not contain any allegations that Google was responsible for the development of the content of offending ISIS videos or that it actively solicited terrorist videos. Indeed, one court has held that interactive computer service providers are eligible for section 230(c)(1) immunity "even where the interactive service provider has an active, even aggressive role in making available content prepared by others," including paying users for content. See Blumenthal v. Drudge , 992 F.Supp. 44, 52 (D.D.C. 1998) ; see also Roommates , 521 F.3d at 1185 (McKeown, J., dissenting) ("the CDA does not withhold immunity for the encouragement or solicitation of information," citing Blumenthal , 992 F.Supp. at 52 ). Therefore, even accepting as true Plaintiffs' allegations that Google shares ad revenue with ISIS, such conduct does not mean that Google is a content developer with respect to ISIS videos.
At the hearing, Plaintiffs also asserted that the allegation that Google shared ad revenue with members of ISIS does not implicate the content of YouTube postings or Google's role as a publisher in any way, since revenue sharing with ISIS is itself the provision of material support. Hr'g Tr. 72 ("you can't share money with a terrorist."). However, to the extent Plaintiffs seek to proceed on this theory, it is not pleaded in the SAC. Although the SAC highlights one example of Google placing a targeted ad with an ISIS video on YouTube, there is no allegation that any revenue was actually shared with the user who posted the video. See SAC ¶ 458. There is also no allegation that the user who uploaded the video is a member of ISIS, and no allegations connecting alleged revenue sharing with the Paris attacks.
Section 230(c)(1)"precludes treatment as a publisher or speaker for 'any information provided by another information content provider.' " Carafano , 339 F.3d at 1125 (emphasis in original) (quoting 47 U.S.C. § 230(c)(1) ). "The critical issue is *1171 whether ... [the interactive computer service] acts as an information content provider with respect to the information" at issue. Id . (quotation omitted). Here, the SAC does not allege that Google acted as an "information content provider" with respect to the information at issue, i.e., the offending ISIS videos. Accordingly, Google satisfies the third element of section 230(c)(1) immunity. Plaintiffs' claims fall within the scope of section 230(c)(1)'s grant of immunity and are therefore barred.[7]
It is an abuse of discretion for a district court to refuse to grant leave to amend a complaint in the absence of an "apparent" reason, such as undue delay, bad faith or dilatory motive, prejudice to the opposing party, futility of the amendments, or repeated failure to cure deficiencies in the complaint by prior amendment. Foman v. Davis , 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962) ; Lockheed Martin Corp. v. Network Sols., Inc ., 194 F.3d 980, 986 (9th Cir. 1999). Accordingly, the SAC is dismissed with leave to amend.
IV. CONCLUSION
For the foregoing reasons, Google's motion to dismiss is granted in part. Plaintiffs' SAC is dismissed with leave to amend. Any amended complaint shall be filed within 14 days of the date of this order.
IT IS SO ORDERED.

For example, Representative Chris Smith described the provision of JASTA that amended the ATA as "open[ing] foreign officials to accountability to so-called secondary liability, such as aiding and abetting or conspiring with terrorist perpetrators." 162 Cong. Rec. H5239-03, 2016 WL 4718240, at *H5244 (Sept. 9, 2016) (emphasis added).

At oral argument, Plaintiffs for the first time argued that in determining the statute's focus for purposes of the two-step extraterritorial inquiry, the court must look at the entire statute, and not just the subsection at issue here. According to Plaintiffs, the focus of the entire CDA is "regulation of speech" on the internet, and the immunity provided in section 230(c)(1) is merely "tangential[ ]." [Docket No. 105 (Hr'g Tr.) 27.] However, Plaintiffs did not brief this argument in their opposition. That alone is reason to ignore it. Moreover, the basis for their position is unclear. Congress enacted the CDA as Title V of the Telecommunications Act of 1996. Pub. L. 104-104, 110 Stat. 56 (Feb. 8, 1996). The CDA included multiple anti-indecency and anti-obscenity provisions or amendments to existing law, including criminal prohibitions against "the knowing transmission of obscene or indecent messages to any recipient under 18 years of age" and "the knowing sending or displaying of patently offensive messages in a manner that is available to a person under 18 years of age." See Reno v. ACLU , 521 U.S. 844, 859-860, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997) (discussing 47 U.S.C. §§ 223(a), (d) ). In asserting that the court must "look at the whole statute," (Hr'g Tr. 27), Plaintiffs did not explain whether they are referring to the entire CDA as enacted in 1996, including its criminal provisions, or to anything else. The court is not obligated to entertain an unbriefed argument, nor is it inclined to try to figure out what Plaintiffs are arguing.

Plaintiffs also argue in a footnote that their ATA claims are not subject to section 230(c)(1) because of 47 U.S.C. § 230(e)(1), which states that "[n]othing in [section 230 ] shall be construed to impair the enforcement of ... any ... Federal criminal statute." Opp'n 18 n.8. Plaintiffs make a convoluted argument that Congress intended the ATA to provide a private means of enforcing federal criminal antiterrorism statutes, and thus the terms of the CDA exempt its application to ATA claims. In other words, Plaintiffs appear to contend that the ATA's civil suit provision is part of the "enforcement" of a federal criminal statute, and thus falls outside section 230(c)(1)'s protections, in accordance with section 230(e)(1). This argument has been considered and rejected by other courts. For example, in Jane Doe 1 v. Backpage.com, LLC , 817 F.3d 12, 23 (1st Cir. 2016), the First Circuit held that "[t]he plain-language reading of section 230(e)(1)'s reference to 'the enforcement of ... any ... Federal criminal statute' dictates a meaning opposite to that ascribed by the appellants: such a reading excludes civil suits." See also Cohen , 252 F.Supp.3d at 157, 2017 WL 2192621, at *12 n.11 (concluding that section 230(e)(1)"does not limit Section 230(c)(1) immunity in civil actions based on criminal statutes but rather extends only to criminal prosecutions," collecting cases).

This argument also appears to implicate the specific immunity afforded by section 230(c)(2), which provides in relevant part that interactive computer service providers and users shall not be held liable for "any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable ..." 47 U.S.C. § 230(c)(2)(A).

Because the court concludes that section 230(c)(1) bars Plaintiffs' claims, it does not reach the parties' arguments about the sufficiency of the claims pleaded in the SAC.